UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL K. KELLER,

       Plaintiff,

v.

MIRI MICROSYSTEMS, LLC,

       Defendant.

_____/

Case No. 12-15492

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT [21]**

This matter comes before the Court on Defendant Miri Microsystems, LLC ("Defendant

LLC")'s motion for summary judgment.  Plaintiff Michael Keller's complaint alleges that

Defendant LLC violated the Fair Labor Standards Act ("FLSA"), 28 U.S.C. §§ 201, *et seq.*,

because it failed to pay Plaintiff overtime.  Defendant LLC responds that Plaintiff was an

independent contractor, not an employee covered by the FLSA.  For the reasons stated

below, this Court agrees with Defendant LLC and GRANTS its motion for summary

judgment.

**I.      Background**

Defendant Miri Microsystems, LLC is a Michigan limited liability company.  Anthony

Miri is the sole member of Defendant LLC and has been since 1995.  (Miri Dep. at 17-18.)

Defendant LLC's income is derived from fulfilling installment contracts for satellite internet

services in Michigan that are provided primarily by HughesNet, a nationwide provider of

satellite internet systems and services.  (Miri Dep. at 23-24.)  It also fulfills installment

contracts for satellite internet services for commercial customers that are provided by iDirect.  It is undisputed that Plaintiff never performed iDirect installation services.  (Miri Dep. at 23-24, 33-34.)  Satellite internet is an attractive alternative to cable and dial-up (DSL telephone line) internet, particularly in rural areas where cable is not available.  (Miri Dep. at 22-23; Pl.'s Dep. at 17-18.)

Defendant LLC acts as a middleman or conduit.  Typically, customers contact HughesNet either through one of its sales agents[1] or online.  HughesNet then contacts a contracted distributor in the customer's geographic area to carry out the installation or other requested service.  (Miri Dep. at 28-29.)  In Michigan, Recreational Sports & Imports (RS&I) has exclusive rights to all customer orders for HughesNet installation, repair, and upgrade services.  Again, based on the customer's geographical location in Michigan, RS&I will assign the customer request order to a fulfillment installer like Defendant LLC.  (Miri Dep. at 28-32, 34-35; Pl.'s Dep. at 19-20.)  Defendant LLC has a written contract with, buys its HughesNet-related equipment from, and gets a commission from RS&I for completed work on installations, repairs, or upgrades.  (Miri Dep. at 34-35, 43.)  Defendant LLC does not have an exclusive territory for the work assigned to it by RS&I.  It has, however, designated that it will accept work in the territory covering the northern-lower peninsula, thumb, and southeastern regions of Michigan.  (Miri Dep. at 102-103.)

---

[1]Defendant LLC is also a sales agent for HughesNet and has a written contract for that relationship.  Sales commissions deriving from that contractual relationship are not Defendant's primary source of revenue; rather, that comes from commissions earned on fulfillment contracts assigned to it from RS&I.  Even if Defendant LLC sells HughesNet services in its area, the installation job must go through RS&I.  (Miri Dep. at 30-31.)  RS&I pays Defendant LLC for completed jobs as follows: $200 for installation; $80 for repairs; $145 for upgrade/dish exchange; and $130 for radio only exchange.  (Miri Dep. at 43.)

Defendant LLC does not provide installation, repair, or upgrade services itself. Instead, it subcontracts out that work to installers who have previously informed Defendant LLC that they want to perform work in the customer's geographical area and are available on the date and time slotted by HughesNet and passed on by RS&I. (Miri Dep. at 34-35, 37-38, 53.) The majority of jobs are pre-scheduled by HughesNet and RS&I into one of two time slots: 8 a.m. - noon and 1 p.m. - 5 p.m. (Miri Dep. at 57-60, 103-105.) For those jobs that are not pre-scheduled, Defendant LLC contacts the customer directly for a date and time slot that is within HughesNet's and RS&I's preferred three-to-seven-day time period for completion. Defendant LLC then assigns the job in the same manner as pre-scheduled jobs. (Miri Dep. at 60-61.) Jobs are assigned to either an a.m. or a p.m. time slot, never a particular time. Installers have the flexibility to reschedule slotted appointment times and to adjust their routes on any given day. (Miri Dep. at 61-62.) Plaintiff admits that he called customers and changed a scheduled time and that Defendant LLC did not require him to perform or accept scheduled jobs. (Pl.'s Dep. at 92-93, 96-97, 104.) Defendant LLC has never disciplined an installer who rescheduled, showed up late, or missed an appointment. (Miri Dep. at 64-65.) An average installation takes about two and one-half hours. (Miri Dep. at 87-88, 108.) Repairs, on the other hand, can take anywhere from 10 minutes to six hours. (Miri Dep. at 88.)

Technically, job assignment and scheduling work as follows. HughesNet and RS&I use a software program, Vanta, to manage requested satellite internet services. Service jobs performed by installers are assigned and tracked through this system. An assigned installer does not get paid for a job until that job is closed on Vanta. (Miri Dep. at 51-52.) For example, if a subcontracted installer for Defendant LLC fails to close out a job, then

3

Defendant LLC and that subcontractor do not get paid until that is done.  HughesNet and RS&I require that all installers sign in and out of an assigned job by calling an interactive voice system.  Defendant LLC, however, has never disciplined or terminated a working relationship if an installer fails to do so.  Defendant LLC simply makes sure that the required information is processed so that payment to both Defendant LLC and the installer is possible. (Miri Dep. at 51-52.)

To assist with scheduling job assignments, Defendant LLC uses a software program, WARP, that accesses Vanta, pulls out scheduling data, and inputs it onto WARP.  For jobs that are not pre-scheduled, Defendant LLC inputs a job assignment in either the a.m. or p.m. time slot.  Each installer has his own portal to sign into in WARP and can see his assigned jobs.  (Miri Dep. at 53, 57-62, 103-05.)   The installer, not Defendant LLC, designates the perimeters governing what job assignments the installer will accept, including the geographical area, the days of the week he wants to work, and the number of jobs per a.m. and/or p.m. time slot he will accept.  For example, it is undisputed that Plaintiff informed Defendant LLC that he could handle 2-4 jobs per day, all days except Sunday, for the geographical area that included St. Clair, Sanilac, Huron, Tuscola, and Macomb counties and limited parts of Lapeer county.  (Def.'s Mot., Ex. 2, 9/11/12 email; Pl.'s Dep. at 69-70, 79-80.)  Other installers did more jobs a day/week than Plaintiff.  (Miri Dep. at 91.)  Others, like ABC Dishman, had subcontractor/installers working with them, allowing them to accept and complete more jobs.  (Miri Dep. at 108-09.)

Installers in a working relationship with Defendant LLC make varying amounts of money because their profits are determined by numerous factors, including geographical area chosen (more drive time, gas expenses if rural, less populated area), number of days

4

and hours willing to work, equipment, and use of helpers.  (Miri Dep. at 106-08.)  Defendant LLC pays installers on a completed-project basis after it receives its commission from RS&I.  For example, Defendant LLC gets $200 for installs from RS&I and pays the installer $110; Defendant LLC gets $80 for repairs from RS&I and pays the installer $60.  (Miri Dep. at 42-43.)

Installers in a working relationship with Defendant LLC have lots of flexibility.  If a customer wants an appointment later than that typically offered in the p.m. slot, Defendant LLC asks an installer if he is available and willing to accept the job.  If not, there is no adverse consequence.  If an installer wants time off for any reason, he simply has to inform Defendant LLC and no jobs will be assigned to him for that time period.  That job simply goes to another installer.  Installers can also refuse a job assignment without any adverse consequences other than the loss of money that would have been earned on that job.  (Miri Dep. at 59, 76-78, 89; Pl.'s Dep. at 92.)  As discussed above, installers can reschedule appointments without adverse consequences and can adjust their routes as they choose.

Defendant LLC has one employee, Rob Neal, who is a technician in charge of Defendant's commercial satellite installation business and Defendant's warehouse.  (Miri Dep. at 24-25.)  Defendant LLC also has three part-time independent contractors who do scheduling and work order processing.  (Miri Dep. at 25-28.)  During the time period at issue here, between March 2011 and November 2012, Defendant LLC had 11 installers (including Plaintiff) performing HughesNet installation, repair, or upgrade jobs assigned to Defendant from RS&I.  (Miri Dep. at 46-47.)

One of Defendant LLC's subcontracted installers is ABC Dishman, who has about six or seven subcontractors (including Plaintiff at one time) performing installation services on

HughesNet jobs assigned to ABC Dishman by Defendant LLC. (Miri Dep. at 41.) The sole proprietor of ABC Dishman was Andrew Clubb. Plaintiff was paid by and performed HughesNet installation services for ABC Dishman from approximately December 2010 until March 2011.

ABC Dishman had Plaintiff and several of his other subcontracted installers attend a HughesNet technician certification course taught by Rob Neal, Defendant LLC's employee and a HughesNet certified trainer. Miri met Plaintiff while he attended that training course along with other ABC Dishman subcontractors. (Miri Dep. at 38-40.) Plaintiff became a certified HughesNet technician while in a working relationship with ABC Dishman. Certification was a HughesNet requirement, not Defendant LLC's. Plaintiff was not required to be re-certified after he terminated his relationship with ABC Dishman. He did, however, have to take an on-line course once HughesNet came out with its "new generation" update. Again, this was a HughesNet requirement, not Defendant LLC's (Miri Dep. at 50.)

After Plaintiff terminated his working relationship with ABC Dishman, he began a working relationship with Defendant LLC.[2] (Pl.'s Dep. at 42-44; Miri Dep. at 40-42.) Plaintiff did not fill out an application or go through any orientation, and he continued to perform the same HughesNet installation, repair, and upgrade services for Defendant LLC that he previously provided for ABC Dishman. (Pl.'s Dep. at 44.) He was still paid based on a completed-project basis (not hourly), but received more money with the middleman – ABC Dishman – out of the way. (Pl.'s Dep. at 38-42.) Plaintiff did not have taxes

---

[2]Because Plaintiff elected to work in a geographical area that ABC Dishman did not elect to service, they were not direct competitors for job assignments from Defendant LLC. (Miri Dep. at 40-42.)

6

withheld from his checks and did not receive any health or other work-related benefits from Defendant LLC.  (Miri Dep. at 41-42, 92; Pl.'s Dep. at 24.)  Plaintiff apparently did not pay taxes on the money Defendant LLC paid him  – he testified that he has not filed tax returns for the past 12 years.  (Pl.'s Dep at 13-14.)   Defendant LLC did not keep written records of the hours Plaintiff worked (Miri Dep. at 92), and Plaintiff concedes that he did not keep records either, but testified that he worked six days a week from 5 a.m. until 12:00 a.m. during his working relationship with Defendant LLC.  (Pl.'s Dep. at 21, 85).

Plaintiff concedes that, while in a working relationship with Defendant LLC, he also performed services where he derived all the profits (or losses), like installing and/or configuring wireless routers and performing Dish Network television satellite installation services.  He also concedes that he did not separate out what portions of his working day were spent on performing services assigned to him by Defendant LLC and what portion was spent on work from which he alone derived a profit (or loss).  (Pl.'s Dep. at  22-23, 26-29, 85-86, 106.)  Plaintiff concedes that Defendant LLC did not restrict an installer from having independent sources of income while in a working relationship with it.  (Pl.'s Dep. at 70-71, 83.)  Indeed, Defendant LLC's sole member, Anthony Miri, testified that he was fully aware that some of the installers working with Defendant LLC, like ABC Dishman, did work for other install companies and that others did unrelated work like carpentry, electrical, painting or roofing.  (Miri Dep. at 47-48, 115.)  Defendant LLC was aware that Plaintiff held himself out to the public as being available to do installation and repair services.  (Miri Dep. at 98.)

After Plaintiff terminated his working relationship with Defendant LLC, he continued to perform HughesNet installation services directly for HughesNet and in competition with

7

Defendant LLC.  He attempted to become a HughesNet dealer and sell HughesNet satellite systems, but gave up because he "couldn't give it away.  No one wanted it."  (Pl.'s Dep. at 33-37.)

## II.    Summary Judgment Standard

It is well established that summary judgment under Federal Rule of Civil Procedure 56 is proper when the movant "shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *U.S. SEC v. Sierra Brokerage Services, Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* Furthermore, the "substantive law will identify which facts are material, and summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*,  477 U.S. at 252.

## III.    Analysis

This Court must determine if a genuine issue of material fact exists on the question whether Plaintiff was Defendant LLC's employee as opposed to an independent contractor outside the scope of the FLSA.  Applying the relevant law and considering the evidence

8

presented in the light most favorable to Plaintiff, the Court concludes that, as a matter of law, Plaintiff was an independent contractor.

It is well-established that "[t]he requirements of the FLSA apply only to employees," and "courts must determine whether, as a matter of economic reality, an individual is an employee or an independent contractor in business for himself." *Freund v. Hi-Tech Satellite, Inc.*, 185 F. App'x 782, 782-83 (11th Cir. 2006) (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 (1947)). *See also, Bartels v. Birmingham*, 332 U.S. 126, 130 (1947) (observing that "employees are those who as a matter of economic reality are dependent upon the business to which they render service"). And, as the Sixth Circuit has observed, "the determination of whether a particular factual setting gives rise to coverage under the FLSA is a matter of law." *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984); *accord, Fegley v. Higgins*, 19 F.3d 1126, 1132 (6th Cir. 1994).

The Sixth Circuit, as well as every other federal court that has considered this issue under similar circumstances, examines six factors to determine the economic reality of the working relationship presented in the case before it.[3]  *See, e.g., Donovan*, 736 at 1117, 1117 n.5; *Freund*, 185 F. App'x at 783; *Chao v. Mid-Atlantic Installation Servs., Inc.*, 16 F.

---

[3]At oral argument, Plaintiff agreed that the economic realities test set out in *Donovan* applies to Plaintiff's FLSA claim. And, despite Defendant's claim to the contrary, Plaintiff acknowledges that the Sixth Circuit applied the FLSA's economic realities test to an age discrimination claim *Lilley v. BTM Corp.*, 958 F.2d 746, 750 (6th Cir. 1992). In *Lilley*, the Sixth Circuit observed that it "employs the economic realities test to determine whether an employment relationship exists for the purposes of the ADEA. This test, developed under the Fair Labor Standards Act ('FLSA'), 29 U.S.C. § 201 et seq., looks to whether the putative employee is economically dependent upon the principal or is instead in business for himself. This test is a loose formulation, leaving the determination of employment status to case-by-case resolution based on the totality of the circumstances." *Id.* (internal citations omitted).

App'x 104, 105-06 (4th Cir. 2001); *Bennett v. Unitek Global Servs., LLC*, No. 10 C 4968, 2013 WL 4804841, at *5 (N.D. Ill. Sept. 9, 2013) (observing that "the Seventh Circuit instructs courts to consider" these same six factors).  Likewise, it is well-established that "none of the six factors is dispositive and instead the totality of the factors and circumstances control."  *Bennett*, 2013 WL 4804841 at *5 (citing *Bartels v. Birmingham*, 322 U.S. 126, 130 (1947)); *Scruggs v. Skylink Ltd.*, No. 3:10-0789, 2011 WL 6026152, *2 n.2 (S.D. W. Va. Dec. 2, 2011) (observing that these six factors "derive from the Supreme Court's decision in *United States v. Silk*, 331 U.S. 704 (1947) ).  *See also Donovan*, 736 at 1116 (observing that "[t]he issue of the employment relationship does not lend itself to a precise test, but is to be determined on a case-by-case basis upon the circumstances of the whole business activity.").  The six factors to be considered are:  "1) the permanency of the relationship between the parties; 2) the degree of skill required for the rendering of the services; 3) the worker's investment in equipment or materials for the task; 4) the worker's opportunity for profit or loss, depending upon his skill;" "5) the degree of the alleged employer's right to control the manner in which work is performed;" and 6) "whether the service rendered is an integral part of the alleged employer's business."  *Id.* at 1117, 1117 n.5.

Because the question whether a plaintiff is an employee or an independent contractor is a question of law, summary judgment is appropriate "[p]rovided there are no disputes of material historical facts."  *Scruggs*, 2011 WL 6026152 at *2.  As show below in the Court's discussion of the relevant six-factors, that is true here -- there are no material factual disputes.  Plaintiff may disagree with the Court's analysis and conclusion, but the material facts to be considered are not in dispute.

10

### 1.  Degree of Permanency in Working Relationship

The first factor considered "focuses on the substance and permanence of the working relationship between a putative employer and the worker." *Id.* at *7.  The "more permanent the relationship" and the "greater exclusivity" of that relationship, the more likely the plaintiff is an "employee" falling within the scope of the FLSA.  *Id.*

Viewing the facts in the light most favorable to Plaintiff, this Court concludes that this factor favors Defendant LLC's argument that Plaintiff was an independent contractor and not an employee.  It is undisputed that there was no contract governing Plaintiff's working relationship with Defendant LLC that would support a finding of permanency.  (Miri Dep. at 45-46.)  More importantly, the undisputed facts show that Plaintiff's and Defendant LLC's working relationship was not "exclusive."  Plaintiff concedes that he performed services for and derived profits from others, i.e., other satellite service providers and individuals.  (Pl.'s Dep. at 22-23, 26-29, 85-86, 106.)  Defendant LLC did not prohibit Plaintiff, or any of the other installers with which it had a working relationship, from performing and getting paid for services provided to other companies like Dish Network, DirecTV, and individuals.  (Pl.'s Dep. at 70-71, 83; Miri Dep. at 47-48, 115.)  Plaintiff also admits that it was he, and not Defendant LLC, who determined how many days a week he would work and how many jobs he agreed to accept each day.  (Pl.'s Dep. at 69-70, 79-80; Def.'s Mot, Ex. 2, 9/11/12 email.)  If, as Plaintiff argues, he had little time to perform services for anyone other than Defendant LLC, that was the result of his own decisions, not Defendant's.  *See Freund*, 185 F. App'x at 784 (reaching the same conclusion for the same reasons in a similar FLSA case involving a satellite installer); *Scruggs*, 2011 WL 6026152 at *7.

These factors distinguish *Solis v. Cascom, Inc.*, No. 3:09-cv-257, 2011 WL 10501391 (S.D. Ohio Sept. 21, 2011), a decision Plaintiff relies on for a contrary result.  In *Cascom*, unlike here, Cascom required that all cable installers "complete an 'employment application;'" "dictated all of the routes, which installers were required to accept or reject in their entirety;" and required workers "to request leave, in writing, to take a day off."  *Id.* at *1.

### 2.  Degree of Skill Required For Services

"A finding of unique or distinctive skills weighs in favor of independent contractor status." *Bennett*, 2013 WL 4804841 at *9.  Numerous other courts have considered this factor in cases involving satellite or cable installers and have concluded that installers like Plaintiff have "special skills" that allow them to properly install, repair, and explain to customers how their satellite or cable systems operate.  *See, e.g., Freund*, 185 F. App'x at 784; *Chao*, 16 F. App'x at 107; *Santelices v. Cable Wiring, Inc.*, 147 F. Supp. 2d 1313, 1320 (S.D. Fla. 2001) (observing that "a cable installer in today's market is considered a skilled tradesman"); *Bennett*, 2013 WL 4804841 at **9-10 (observing that the "skills of cable installers are akin to those of carpenters, construction workers, and electricians, who are usually considered independent contractors"); *Scruggs*, 2011 WL 6026152 at *7 (same).  Plaintiff concedes that, as a HughesNet satellite internet installer, he was required to have specialized, technical training.  He also concedes that he had special knowledge to do repairs or upgrades and had specialized skills allowing him to operate a "DAFT" meter for locating the strongest satellite signal and tuning the dish to that signal.  (Pl.'s Dep. at 15-17, 84-85, 112-13; Pl.'s Resp. at 14.)  It is also undisputed that an installer must have some computer skills, customer communication skills, and basic knowledge of electrical

wiring/grounding (as well as national and local codes) and household construction. Installers use their independent judgment and special skills to determine how best to approach an installation, repair, or upgrade job. (Miri Dep. at 65-67, 117-118.) Moreover, the transient nature of Plaintiff's employment history as an installer -- working as an installer with ABC Dishman before doing so with Defendant LLC and continuing to provide HughesNet satellite installations after terminating those relationships -- supports the conclusion that he possessed "special skills" that gave him the opportunity and flexibility to choose when to begin or end a working relationship. Accordingly, this factor also weighs in favor of finding Plaintiff an independent contractor rather than Defendant LLC's employee.

### 3.   Worker's Capital Investment in Equipment/Materials/Tools

It is undisputed that Plaintiff was responsible for providing his own work vehicle and equipment and did so. During his working relationship with Defendant LLC, Plaintiff used his wife's van, had that van modified to accommodate a printer that he purchased and installed, and used the printer along with his lap top computer to print out work-related materials. Plaintiff also provided his own work materials, including tools, ladder, cell phone with an app for locating satellites and a "Square Reader" attachment device for customer charge/debit cards, and a "DAFT" meter. (Pl.'s Dep. at 28, 53-54, 56, 59-60, 62-64, 72-75, 81-83, 110-112; Miri Dep. at 69, 97, 114-115.)   He also maintained, at his own cost, general commercial liability insurance with Defendant LLC named as an "additional insured."   (Pl.'s Dep. at 83; Miri Dep. at 112; Def.'s Mot., Ex. 3, email and proof of insurance.)   Numerous courts have found similar facts weigh "in favor of finding independent contractor status." *Scruggs*, 2011 WL 6026152 at *6 (finding that, when it was

13

undisputed that the plaintiff/installer was "responsible for providing [his] own work equipment and vehicles," this was "a compelling indication" that the plaintiff was not an employee).  *See also Freund*, 185 F. App'x at 783-84; *Chao*, 16 F. App'x at 107; *Bennett*, 2013 WL 4804841 at *9 (observing that the plaintiff/installers "were required to procure their own insurance and have their own vehicles and ladders for the installation services" and finding that "these facts [were] indicative of at least some 'economic independence'").

In *Keeton v. Time Warner Cable, Inc.*, No. 2:09-CV-1085, 2011 WL 2618926 (S.D. Ohio July 1, 2011), the district court rejected an argument similar to that raised by Plaintiff here -- this factor should weigh in favor of Plaintiff because his capital investment is less significant than that of Defendant LLC.  It found "[t]he fact that Time Warner always provided the cable equipment, not tools" required for the plaintiffs' daily installation duties, "does not equate with having made a significant capital investment."  *Id.* at *5.  Rather, it concluded that "[b]ecause the evidence upon which Plaintiffs rely does not demonstrate that Time Warner made a significant capital investment into tools required to execute the installation process, a reasonable fact-finder would have to conclude that this factor does not support a finding that Plaintiffs were Time Warner employees."  *Id.*

Consistent with the analysis and conclusion in the above decisions, this Court finds that this factor also weights in favor of finding Plaintiff an independent contractor, not Defendant LLC's employee.

### 4.  Degree of Alleged Employer's Right to Control Manner Work Performed

Under this factor of the "economic reality" test, the Court examines the nature of the working relationship and determines whether the alleged employer's degree of control over the "manner and method" of the installer's work performance "tends to indicate that the

14

individual was an employee under the 'control' of the employer." *Bennett*, 2013 WL 4804841 at *6. "Courts, in evaluating this factor, have considered such details as whether workers may choose how much and when to work, . . . whether they must wear uniforms, and how closely their work is monitored and controlled by the purported employer." *Scruggs*, 2011 WL 6026152 at *3 (internal quotation marks and citation omitted).

Here, the undisputed evidence shows that Plaintiff had a great deal of control over and flexibility to alter the "manner and method" with which he performed installation services. For example, it was Plaintiff, not Defendant LLC, that determined the geographical area where he would perform installation, repair, or upgrade services; the number of jobs he would accept per day; the days of the week on which he would work; and how he would tackle a particular job. (Pl.'s Dep. at 69-70, 79-80; Def.'s Mot., Ex. 2, 9/11/12 email.) Although Plaintiff did not schedule his job assignments, he had the flexibility to reschedule a slotted appointment time and to adjust his route on any given day. (Miri Dep. at 61-62; Pl.'s Dep. at 96.) Indeed, Plaintiff admits that he called customers and changed a scheduled time and that Defendant LLC did not require him to perform or accept scheduled jobs. (Pl.'s Dep. at 92-93, 96-97, 104.) Defendant LLC has never disciplined an installer who rescheduled, showed up late, or missed an appointment. (Miri Dep. at 64-65.) Moreover, if an installer wanted time off for any reason, he simply had to inform Defendant LLC and no jobs would be assigned to him for that time period. There were no adverse consequences for taking time off; another installer would be simply be assigned to and paid for jobs assigned in that time period. (Miri Dep. at 59, 76-78, 89; Pl.'s Dep. at 92.)

Defendant LLC did not supervise installation services and was not concerned with the specific manner in which installers like Plaintiff completed an installation job. (Miri Dep. at

15

111-112; Pl.'s Dep. at 97.)  HughesNet and RS&I did require that all installers sign in and out of an assigned job by calling an interactive voice system, but Defendant LLC never disciplined or terminated a working relationship if an installer failed to do so.  Defendant LLC simply made sure that the required information was processed so that payment could be made to both Defendant LLC and the installer.  (Miri Dep. at 51-52.)

Plaintiff admits that Defendant LLC was not concerned with how he accomplished the job as long as it met HughesNet specifications.  (Pl.'s Dep. at 97-98.)  That Plaintiff was required to meet HughesNet specifications and was required to sign in and out of an assigned job do not weigh in favor of finding him Defendant LLC's employee.  As the district court observed in *Scruggs*, "[r]equiring installers to meet installation specifications for a customer, and to provide periodic updates on an order's status, is entirely consistent with the standard role of a contractor who is hired to perform highly technical duties."  *Scruggs*, 2011 WL 6026152 at *3 (internal quotation marks and citation omitted); *Bennett*, 2013 WL 4804841 at *7 (same).  *See also Freund*, 185 F. App'x at 783 (finding the defendant's "interest in Freund's work was the end result of customer satisfaction, and not with the day-to-day regulation of his work habits, hours worked or work methods"); *Chao*, 16 F. App'x at 106 (finding, under similar facts, "that the manner in which the Installers complete their work is left to their broad discretion and business judgment, which suggests they are independent contractors.").

Plaintiff concedes that, while in a working relationship with Defendant LLC, he was not precluded from performing installation services and/or configuring routers for others and did so.  (Pl.'s Dep. at 22-23, 26-29, 70-71, 83, 85-86, 106.)  It is undisputed that Defendant LLC never had any restrictions on installers doing work for others and was aware that some

16

of the other installers with whom he had working relationship, like ABC Dishman, did so. (Miri Dep. at 47-48, 98, 115.)  *See Freund*, 185 F. App'x at 783 (affirming the district court's consideration of similar facts as supporting a finding that the installer was an independent contractor rather than an employee).

Plaintiff also had "helpers" who assisted him on his installation jobs while in a working relationship with Defendant LLC.  He admits he paid a young man named Kyle.  He also admits that his wife accompanied him on jobs and helped him by communicating with customers and completing paperwork.  Defendant LLC did not prohibit or discipline Plaintiff or other installers from using helpers, even though HughesNet required that all helpers be certified.  (Pl.'s Dep. at 44-50, 86, 105-06.)

Similar to the vast majority of courts considering this factor under similar circumstances, this Court finds that Plaintiff was an independent contractor, not an employee.  *See, e.g., Freund*, 185 F. App'x 783, 784; *Chao*, 16 F. App'x at 106; *Donovan*, 736 F.2d at 1119; *Bennett*, 2013 WL 4804841 at **8-9; and *Scruggs*, 2011 WL 6026152 at **3-5.

### 5.  Opportunity For Profit Or Loss

Overlapping previous considerations, the Court now considers whether Plaintiff's working relationship with Defendant LLC allowed him the opportunity to control his profits or losses.  "The extent to which an individual is able to 'generate more money based on skill and hard work' may tend to establish independent contractor status."  *Scruggs*, 2011 WL 6026152 at *6 (quoting *Herman v. Mid-Atlantic Installation Servs., Inc.*, 164 F. Supp. 2d 667, 674 (D. Md. 2000), *aff'd sub nom Chao v. Mid-Atlantic Installation Servs., Inc.*, 16

17

F. App'x 104 (4th Cir. 2001)).  For many of the reasons discussed above, this Court finds that Plaintiff had the ability to control whether he made a profit.

Plaintiff alone determined the geographical area he wanted to service, his work days, and the number of jobs he would accept per day.  Because he was compensated by the job and not the hour, those decisions affected how much profit he would earn.  For example, if he chose a less rural area to service with less travel time and travel-related costs (gas/vehicle wear and tear), he would have had the opportunity to earn more.  (Miri Dep. at 107-108.)  If Plaintiff chose to hire trained skilled workers, he would have had the opportunity to earn more, similar to Defendant LLC's subcontractor ABC Dishman.  (Pl.'s Dep. at 50, 78; Miri Dep. at 86, 108.)  Plaintiff's management decisions, not Defendant LLC's, determined his ability to turn a greater profit.  (Pl.'s Dep. at 57, 77-78, 86, 100-101; Miri Dep. at 73-74, 111-13.)  In addition, Plaintiff admits that he did some independent installation work, *e.g.*, routers, from which he derived all of the profits.  (Pl.'s Dep. at 63.) Plaintiff's management decisions here, i.e., accept fewer jobs from Defendant LLC or hire help and thus have more time to install more routers independently, similarly determined his ability to earn greater profits.  Accordingly, this factor also supports a finding that Plaintiff was an independent contractor, not an employee.  *See Freund*, 185 F. App'x at 783; *Chao*, 16 F. App'x at 107; *Bennett*, 2013 WL 4804841 at *8.

### 6.  Installation Services And Defendant LLC's Business

The sixth and final factor considered in the Sixth Circuit's economic realities test requires this Court to consider whether the services Plaintiff provided were an integral part of Defendant LLC's business.  Although Defendant LLC claims that it merely coordinates HughesNet installation, repair, and upgrade services like those provided by Plaintiff, those

18

services were an integral part of Defendant LLC's business.  Accordingly, this factor favors

a finding that Plaintiff was an employee rather an independent contractor.  Nonetheless,

similar to other courts addressing this factor under similar circumstances, this Court

concludes that "this factor, standing alone, does not create an employment relationship"

covered by the FLSA.  *Chao*, 16 F. App'x at **3-4.  *See also, Freund*, 185 F. App'x at 784

(same); *Bennett*, 2013 WL 4804841 at *10 (same); *Scruggs*, 2011 WL 60226152 at *8

(finding that, although "cable installation technicians are the lifeblood of Skylink" and "this

factor superficially contributes to the inference" that the plaintiffs were Skylink employees,

"other courts have found on similar facts that this factor alone cannot alter the overall

impression that . . . installers are economically independent.") (internal quotation marks and

citations omitted).

### 7.  Analysis of Factors

As the *Scruggs* court observed, there is a split in the courts considering the issue

whether cable or internet installers are independent contractors or employees under the

FLSA.  *See Scruggs*, 2011 WL 6026152 at *8, *8 n.9 (citing cases).  Each of those courts

decided the issue, however, based on the facts before them.  This Court does the same.

Applying the relevant law and considering the evidence presented in the light most

favorable to Plaintiff, the Court concludes that, as a matter of law, Plaintiff was an

independent contractor.  Given that five of the six factors considered in the economic reality

test weigh in favor of finding that Plaintiff was an independent contractor, not Defendant

LLC's employee, it would not be reasonable for a jury to conclude otherwise.[4]  Accordingly,

Defendant's motion for summary judgment is GRANTED.

**IV.   Conclusion**

For the above-stated reasons, Defendant's motion for summary judgment is

GRANTED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  March 20, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record
on March 20, 2014, by electronic and/or ordinary mail.

s/Johnetta M. Curry-Williams
Case Manager
Acting in the Absence of Carol A. Hemeyer

---

[4]In light of this decision, it is not necessary to consider Defendant LLC's additional
argument that Plaintiff's FLSA claim for overtime must be dismissed because Plaintiff
admits he has no record of the hours he worked.

20