# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540

Deborah S. Hunt    POTTER STEWART U.S. COURTHOUSE    Tel. (513) 564-7000

Clerk        CINCINNATI, OHIO 45202-3988    www.ca6.uscourts.gov

Filed:  March 26, 2015

Mr. Aaron D. Graves
Mr. Donald H. Scharg
Bodman
201 W. Big Beaver Road, Suite 500
Troy, MI 48084

Mr. David A. Hardesty
Ms. Caitlin E. Malhiot
Gold Star Law
2701 Troy Center Drive, Suite 400
Troy, MI 48084

    Re: Case No. 14-1430*, Michael Keller v. Miri Microsystems LLC*
       Originating Case No. : 2:12-cv-15492

Dear Counsel,

  The court today announced its decision in the above-styled case.

  Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

       Yours very truly,

       Deborah S. Hunt, Clerk


       Cathryn Lovely
       Deputy Clerk

cc:  Mr. David J. Weaver

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0055p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

_____

MICHAEL KELLER,

*Plaintiff-Appellant,*

*v.*

No. 14-1430

MIRI MICROSYSTEMS LLC,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:12-cv-15492—Nancy G. Edmunds, District Judge.

Argued:  November 19, 2014

Decided and Filed:  March 26, 2015

Before:  NORRIS, MOORE, and GIBBONS, Circuit Judges.

_____

### COUNSEL

**ARGUED:**  David A. Hardesty, GOLD STAR LAW, P.C., Troy, Michigan, for Appellant.
Aaron D. Graves, BODMAN PLC, Troy, Michigan, for Appellee.  **ON BRIEF:**  David A.
Hardesty, Caitlin E. Malhiot, GOLD STAR LAW, P.C., Troy, Michigan, for Appellant.  Aaron
D. Graves, Donald H. Scharg, BODMAN PLC, Troy, Michigan, for Appellee.

MOORE, J., delivered the opinion of the court in which GIBBONS, J., joined.  NORRIS,
J. (pp. 20–24), delivered a separate dissenting opinion.

1

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.   Defendant Miri Microsystems, LLC ("Miri") is a satellite-internet-dish installation company.   Michael Keller installed satellite-internet dishes for Miri's customers six days each week.   Keller alleges that Miri did not compensate him adequately as an employee under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 207 *et seq.*, by failing to pay him overtime compensation.   Miri contends, in contrast, that Keller was an independent contractor, rather than an employee, and therefore not entitled to overtime pay.

The FLSA's definition of "employee" is strikingly broad and "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles."   *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).   To effect Congress's broad purpose, we must look to see whether a worker, even when labeled as an "independent contractor," is, as a matter of "economic reality," an employee. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947) ("Where the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the Act.").   Ordinarily, it is the court's job to determine whether a company has inappropriately classified a worker as an independent contractor.   *Werner v. Bell Family Med. Ctr., Inc.*, 529 F. App'x 541, 543 (6th Cir. 2013). However, when the evidence, viewed in the light most favorable to the plaintiff, reveals that there is a genuine issue of material fact whether the worker is an employee or an independent contractor, then summary judgment is inappropriate.   *See Imars v. Contractors Mfg. Servs., Inc.*, No. 97-3543, 165 F.3d 27, 1998 WL 598778, at *6 (6th Cir. Aug. 24, 1998).   In those cases, it is the task of the trier of fact to review the evidence and weigh the factors to decide whether the plaintiff-worker is economically dependent upon the defendant-company.   *See Id.*   We believe that this is just such a case.

We also must decide whether Keller has offered sufficient evidence that he worked more than forty hours each week based on his and Miri's deposition testimony.   We believe that Keller

has presented sufficient evidence to show a genuine issue of material fact. Accordingly, we **VACATE** the district court's judgment and **REMAND** the case for consideration by the trier of fact.

## I. BACKGROUND

Miri is a limited liability company that operates in Michigan and provides installation services for HughesNet and iDirect, nationwide providers of satellite internet systems and services. Keller was one of approximately ten satellite-internet technicians who installed satellite dishes for Miri.

Miri is one of many middlemen in the satellite-installation-services business. Customers purchase satellite internet services from HughesNet, and then HughesNet forwards those orders on to a distributor, Recreational Sports and Imports ("RS&I").[1] Next, RS&I sends the installation order to Miri, which provides installation services for the upper part of the Lower Peninsula of Michigan. Customers may choose a time block during which a technician will install the satellite dish, and Miri assigns installation jobs to technicians who work in the territory where the customer resides.

Keller began installing satellite dishes for Miri as a technician while he was working for ABC Dishman, a subcontractor, after he attended a HughesNet satellite-dish-installation certification course given by Miri. After working for ABC Dishman for some time, Keller began installing satellite-internet dishes for Miri directly.

Miri pays technicians by the job, not by the hour. HughesNet pays Miri $200 for each basic installation, $80 for repairs, $80 for de-installation, and between $130–145 for upgrades. Miri pays the technician the bulk of these fees, but keeps a percentage.[2]

Keller worked six days a week from 5:00 am to midnight, taking only Sunday off. Keller completed two to four installations per day, and he had to travel between jobs. Miri paid Keller

---

[1] Miri sometimes operates as a sales agent for HughesNet, but the majority of Miri's business comes from HughesNet's referrals.

[2] The record does not establish what percentage of these fees Miri kept.

$110 per installation and $60 for each repair he performed. Miri did not withhold federal payroll taxes from Keller's payments or provide Keller benefits.

On November 23, 2012, Keller stopped working for Miri. Soon thereafter, he filed this lawsuit, alleging that Miri's payment system violates the FLSA. Miri filed a motion for summary judgment, arguing that Keller was an independent contractor for Miri, and therefore he was not entitled to overtime compensation under the FLSA. The district court granted Miri's motion for summary judgment, holding that Keller was an independent contractor for Miri, not an employee. Keller appeals. Miri also argues that Keller has not produced evidence to substantiate his claim that he worked more than forty hours per week.

## II. DISCUSSION

### A. Standard of Review

We review de novo a district court's order granting summary judgment, applying the standard set forth in Rule 56(a). *Ellington v. City of E. Cleveland*, 689 F.3d 549, 552 (6th Cir. 2012). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When conducting a review of the evidence under Rule 56(a), we view the evidence, "and all inferences drawn therefrom, in the light most favorable to the non-moving party"—Keller. *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000). Summary judgment is improper if Keller has produced evidence "'such that a reasonable jury could return a verdict'" in his favor. *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The relevant inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.* (quoting *Anderson*, 477 U.S. at 251–52).

Whether a FLSA plaintiff is an employee is a mixed question of law and fact. *Lilley v. BTM Corp.*, 958 F.2d 746, 750 n.1 (6th Cir. 1992). "[W]here there is a genuine issue of fact or conflicting inferences can be drawn from the undisputed facts, . . . the question is to be resolved by the finder of fact in accordance with the appropriate rules of law." *Id.* (holding that employee

status was an issue for a jury to resolve). We must therefore decide whether there is a genuine dispute of material fact as to whether Keller was an employee such that summary judgment is inappropriate.

## B. Employee Status

Congress passed the FLSA with broad remedial intent. *See Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 509–11, 515 (1950) ("[T]he primary purpose of Congress . . . was to eliminate, as rapidly as practicable, substandard labor conditions throughout the nation."). The FLSA aimed to "correct 'labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers . . . .'" *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984) (quoting *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 143 (6th Cir. 1977)). "The FLSA requires . . . employers to pay employees engaged in commerce a wage consistent with the minimum wage," *Ellington*, 689 F.3d at 552 (citing 29 U.S.C. § 206(a)), and instructs employers to pay employees overtime compensation, which must be no less than one-and-one-half times the regular rate of pay, if the employee works more than forty hours in a week. *Id.* (citing *Baden-Winterwood v. Life Time Fitness, Inc.*, 566 F.3d 618, 626 (6th Cir. 2009)). Courts interpreting the FLSA must consider Congress's remedial purpose. *See Lilley*, 958 F.2d at 750.

Under the FLSA, only employees are entitled to overtime and minimum-wage compensation. *See Ellington*, 689 F.3d at 553. Independent contractors do not enjoy FLSA's protections. *See Rutherford*, 331 U.S. at 729. The Supreme Court has recognized, however, that businesses are liable to workers for overtime wages even if the company "put[s] . . . an 'independent contractor' label" on a worker whose duties "follow[] the usual path of an employee." *Rutherford*, 331 U.S. at 729. To carry out the remedial purpose of the FLSA, we must examine whether a business has misclassified an employee as an independent contractor.

The FLSA defines an "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). According to the FLSA, "'[e]mploy' includes to suffer or permit to work." *Id.* § 203(g). We have interpreted this framework, in light of the legislative purpose, to set forth a standard that "'employees are those who as a matter of economic reality are dependent upon the business to which they render service.'" *Brandel*, 736 F.2d at 1116 (quoting *Carriage*

*Carpet*, 548 F.2d at 145). To assist our application of the economic-reality test, we have identified six factors to consider:[3]

> 1) the permanency of the relationship between the parties; 2) the degree of skill required for the rendering of the services; 3) the worker's investment in equipment or materials for the task; 4) the worker's opportunity for profit or loss, depending upon his skill; . . . 5) the degree of the alleged employer's right to control the manner in which the work is performed[; and] . . .

> [6)] whether the service rendered is an integral part of the alleged employer's business.

*Id.* at 1117 & n.5. We have also considered whether the business had "authority to hire or fire the plaintiff," and whether the defendant-company "maintains the plaintiff's employment records." *Ellington*, 689 F.3d at 555. No one factor is determinative; "[a] central question is the worker's economic dependence upon the business for which he is laboring." *Brandel*, 736 F.2d at 1120. Accordingly, we address each factor in turn with an eye toward the ultimate question— Keller's economic dependence on or independence from Miri.

### 1. The Permanency of the Relationship

Generally, independent contractors have variable or impermanent working relationships with the principal company because they "often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and indefinite in duration." *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998) (internal quotation marks omitted). If a worker has multiple jobs for different companies, then that weighs in favor of finding that the worker is an independent contractor. *See Brandel*, 736 F.2d at 1117. We may look at the length and regularity of the working relationship between the parties, *see Baker*, 137 F.3d at 1442, but even short, exclusive relationships between the worker and the company may be indicative of an employee-employer relationship. *See Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir. 1987) ("[H]owever temporary the relationship may be [between migrant workers and farm owner,] it is permanent and exclusive for the duration of that harvest season.").

---

[3]In *Brandel*, we considered whether the plaintiffs were employees under the FLSA on appeal from the district court's denial of an injunction after the district court had made specific factual findings. *See Brandel*, 736 F.2d at 1115, 1117.

The record before us establishes that there is a material dispute as to whether Keller and Miri had a de facto exclusive working relationship.

The district court used three facts to determine the permanence of Keller's and Miri's working relationship. First, Keller did not have a contract with Miri. This fact cannot inform our analysis, however, because we have rejected the argument that "contractual intention [is] a dispositive consideration in our analysis. The reason is simple: The FLSA is designed to defeat rather than implement contractual arrangements." *Imars*, 1998 WL 598778, at *5 (internal quotation marks omitted). Accordingly, we do not consider this fact in our analysis.

Second, Miri and Keller did not have an exclusive relationship; Keller could work for other satellite-dish-installation companies. We agree with the Second Circuit and conclude that "employees may work for more than one employer without losing their benefits under the FLSA." *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1060 (2d Cir. 1988) (citing *Walling v. Twyeffort, Inc.*, 158 F.2d 944, 947 (2d Cir. 1947)); 29 C.F.R. § 791.2 (1987)). It is one factor of many to consider in determining whether a worker is economically dependent upon the defendant company.

Third, the control Keller exercised over the number of days per week he worked and how many jobs he took each day informs our analysis of the permanency and exclusivity of the relationship. Schedule variability can serve as an indicator of independent-contractor status; however, "workers have been deemed employees where the lack of permanence is due to operational characteristics intrinsic to the industry rather than to the workers' own business initiative." *Id.* at 1060–61.

There is a genuine dispute of material fact about whether Miri and Keller had an exclusive working relationship. Keller worked for Miri for nearly twenty months. Appellant Br. at 16. Keller's actions suggest that he treated Miri as his permanent employer: he never turned down an assignment, and he believed Miri could fire him for intransigence. On the other hand, the fact that Miri never explicitly prohibited Keller from performing installation services for other companies, and Keller could choose not to work some days, leaving free time to work for other companies, favor a finding that the relationship was impermanent.

Even so, there is a genuine dispute about whether Keller and Miri had a de facto exclusive relationship. *See Keeton v. Time Warner Cable, Inc.*, No. 2:09-CV-1085, 2011 WL 2618926, at *4 (S.D. Ohio July 1, 2011) (workers' "work schedules ensured they only completed Time Warner installations on any given day."). Keller asserts that he did not have time to work for any other company. Technicians, like Keller, work only when a customer needs HughesNet to install or repair his or her satellite dish. When Miri has assignments in counties where multiple technicians work, Miri assigns the installation jobs based on the technician's availability and location. Where the customer lives, when the customer is available, and the amount of time needed to drive to the customer's house—these factors are outside of the technician's control and affect the technician's ability to perform more than three or four installations each day. Moreover, the whole installation process takes approximately two-and-a-half hours to complete, but may take longer if the customer requires that the technician mount the dish onto a pole. Repairs may take less or more time depending on the customer's needs. Even the most efficient technician could not finish four jobs in a day under eight hours, suggesting that technicians have slim control over their working hours and little ability to work for other companies. And the evidence is inconclusive whether technicians are able to engage in other economic ventures. Thus, there is a genuine dispute of material fact as to whether Keller and Miri had an exclusive, permanent relationship in practice.

## 2. The Degree of Skill Required

The second factor we consider is Keller's skill. "Skills are not the monopoly of independent contractors." *Lauritzen*, 835 F.2d at 1537. More important to our inquiry is whether Keller's profits increased because of the "initiative, judgment[,] or foresight of the typical independent contractor," or whether his work "was more like piecework." *Rutherford*, 331 U.S. at 730.

There is ample evidence in the record to support a finding that satellite-dish-installation technicians are skilled workers. Before technicians can begin working for Miri, they must obtain a HughesNet certification. Technicians also need basic computer skills, such as the ability to use Windows, Macintosh iOS, and WARP, Miri's scheduling software. In addition, technicians must be able to use basic hand and power tools, know National Electrical Code provisions, and

have the ability to identify whether the satellite was picking up a signal.  Thus, Keller was a skilled worker.

To a certain extent, however, every worker has and uses relevant skills to perform his or her job, but not everyone is an independent contractor.  It is also important to ask how the worker acquired his skill.  *See Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1318 (11th Cir. 2013) ("The meaningfulness of this skill as indicating that plaintiffs were in business for themselves or economically independent, however, is undermined by the fact that Knight provided most technicians with their skills.").  If a worker learned his craft through formal education, an apprenticeship, or years of experience, then it is more likely that the worker's compensation varies with his unique skill and talent.  On the other hand, if the worker's training period is short, or the company provides all workers with the skills necessary to perform the job, then that weighs in favor of finding that the worker is indistinguishable from an employee.  *See id.*

Miri provided technicians a significant portion of the training required to obtain the HughesNet certification.  First, HughesNet requires the future technician to take an online class.  Next, the technician must attend a one-day, in-person class conducted by a HughesNet certified trainer.  Miri's employee, Rob Neal, conducted this training on Miri's behalf.  Thus, Miri provided Keller with the critical training necessary to do the work.

Of course, a technician's skill may affect his efficiency.  But this is not the type of profession where success rises or falls on the worker's special skill.  In contrast with carpenters, for example, who have unique skill, craftsmanship, and artistic flourish, technicians' success does not depend on unique skills:  a pole mount is a pole mount, a roof mount is a roof mount, and the record suggests that it is easy to learn how to decide which is more appropriate and how to install each type of dish.  Moreover, the record does not suggest that Miri, RS&I, or HughesNet selected technicians on the basis of anything other than availability and location, and therefore Miri did not select Keller for assignments because he was particularly skillful.[4]  Accordingly, there is a genuine issue of material fact regarding whether the degree of skill required of Keller shows that he was an employee or an independent contractor.

---

[4]Indeed, Miri simply stated that the company was "satisfied with the amount of work and [Keller's] work performance for the most part until toward the end."  R. 24-2 at 26 (A. Miri Dep. at 91–92) (Page ID #349).

### 3. Keller's Investment

The next factor we weigh is whether the worker has made a significant capital investment.  We have stated that "[t]he capital investment factor is most significant if it reveals that the worker performs a specialized service that requires a tool or application which he has mastered or that the worker is simply using implements of the [company] to accomplish the task."[5]  *Brandel*, 736 F.2d at 1119.  Keller argues that we should consider his investment in comparison with Miri's investment.  Other courts have compared the "worker's individual investment to the employer's investment in the overall operation."  *Baker*, 137 F.3d at 1442 (citing *Lauritzen*, 835 F.2d at 1537); *see also Hopkins v. Cornerstone Am.*, 545 F.3d 338, 344 (5th Cir. 2008) ("In applying the relative-investment factor, we compare each worker's *individual* investment to that of the alleged employer."); *Dole v. Snell*, 875 F.2d 802, 810 (10th Cir. 1989) ("[T]he 'investment' which must be considered as a factor is the amount of large capital expenditures, such as risk capital and capital investments, not negligible items, or labor itself.  The relative investment of the [cake] decorators in their own tools compared with the investment of the [defendants] simply does not qualify as an investment in this business."); *Doe v. Cin-Lan, Inc.*, No. 08-CV-12719, 2008 WL 4960170, at *13–14 (E.D. Mich. Nov. 20, 2008) ("As a result, this Court . . . concludes that whatever the precise size of Doe's financial investment in her work may have been, it was minor enough in comparison with the overall costs of her business to suggest that she was an FLSA employee, and not an independent contractor.").  We agree that courts must compare the worker's investment in the equipment to perform his job with the company's total investment, including office rental space, advertising, software, phone systems, or insurance.  *Hopkins*, 545 F.3d at 344.

There is one additional wrinkle, however.  When considering the worker's capital investment in the equipment needed to perform his job, we must consider those investments in light of the broader question:  whether that capital investment is evidence of economic independence.  Accordingly, there are inherently some capital investments that do not necessarily evidence economic independence.  For example, "investment of a vehicle is no small matter, [but] that investment is somewhat diluted when one considers that the vehicle is also used

---

[5]The *Brandel* court concluded that this factor was not important to determine whether pickle pickers were employees under the FLSA because of the particular system of harvest the defendant used.  736 F.2d at 1119.

by most drivers for personal purposes." *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 304 (5th Cir. 1998). On the other hand, investment in something like welding equipment signals a greater degree of economic independence because it is not a common item that most people use daily. *See id.*; *see also Scantland*, 721 F.3d at 1317-18 ("[I]n light of the fact that most technicians will already own a vehicle suitable for the work and that many technicians purchased specialty tools from Knight directly via payroll withholdings, there seems to be little need for significant independent capital and very little difference from an employee's wages being increased in order to pay for tools and equipment."). The same logic also applies to computer equipment and basic hand tools—tools many people have for personal use.

With those guiding principles in mind, we turn to the evidence in this record, considering the evidence in the light most favorable to Keller. The undisputed facts demonstrate that Keller made some capital investment in his work. Keller drove to and from installation jobs in his wife's van for which he held auto insurance.[6] For the most part, technicians paid for gas. Twice, HughesNet provided a gas stipend of five dollars when gas prices were very high, which Miri passed along to technicians. Keller primarily used tools that he owned before he began working for Miri, such as drills and wrenches. He also used a few electronic devices to help collect payment and submit workorders to Miri: an application for his smartphone to charge credit cards, a printer, and a digital camera. He did not rent office space.

Installation requires a dish, cable, transmitter, modem, some hardware, and materials for pole mounts. Keller provided some of these materials, but Miri did, too. Technicians are responsible for providing up to 125 feet of cable, which cost approximately eight cents per foot, to the customer at no cost. Keller purchased coaxial cable from Miri, which Miri deducted from his paycheck. In addition, technicians must provide F-adaptors, ground clamps, zip ties, and dielectric grease or electrical tape to ground and seal the wires. The record does not provide evidence about the cost of those materials, but Miri testified that the cost varies depending on the quality of the products the technician uses, and technicians are free to use cheaper materials provided they meet HughesNet's specifications. Miri provided technicians with the dishes, transmitters, and modems, and reimbursed technicians for the cost of cement. We note,

---

[6] Miri required that Keller's policy list Miri as an additionally insured party.

however, that a reasonable factfinder might find that dishes, transmitters, and modems are products that the customers purchased from Miri.

Miri made significant capital investments in its business. The company rents office space, which is open to the public six days a week. Moreover, Miri uses phones and computers to schedule installation appointments.

Thus, the record supports a finding that Keller and Miri invested capital in the equipment, tools, and facilities necessary for the satellite-dish-installation business. To the extent the record establishes that Keller made significant capital investments in the equipment he used on the job, it does so "weakly." *Scantland*, 721 F.3d at 1317. Nearly all of the equipment Keller used is common in many households, and Keller used it for both personal and professional tasks. Because this question arises in the context of a motion for summary judgment, we believe the trier of fact should decide how Keller's capital investments compared to Miri's, and whether Keller's capital investments demonstrate that Keller was economically independent.[7]

### 4. Keller's Opportunity for Profit or Loss

The next factor to consider is whether Keller had an opportunity for greater profits based on his management and technical skills. *Brandel*, 736 F.2d at 1119. The district court made four observations relevant to determine the degree of control Keller had over his profitability: (1) Keller determined the geographical region where he worked; (2) he had control over how many jobs he took each day; (3) he could have hired other technicians to work for him; and (4) he earned some money from Dish Network television for selling routers. The district court concluded that this factor supports a finding that Keller was an independent contractor. We

---

[7] We recognize that some circuit and district courts have found that investments in vans and hand tools favored independent-contractor status. *See, e.g.*, *Freund v. Hi-Tech Satellite, Inc.*, 185 F. App'x 782, 783–84 (11th Cir. 2006) (upholding a district court finding that a cable installer invested in the equipment necessary to perform installations because "[h]e drove his own vehicle and provided his own tools and supplies for each installation."); *Keeton*, 2011 WL 2618926, at *5 ("Because the evidence . . . does not demonstrate that Time Warner made a significant capital investment into tools required to execute the [cable] installation process, a reasonable fact-finder would have to conclude that this factor does not support a finding that Plaintiffs were Time Warner employees."); *Scruggs v. Skylink, Ltd.*, No. 3:10–0789, 2011 WL 6026152, at *6 (S.D. W.Va. Dec. 2, 2011) ("This factor weighs in favor of finding independent contractor status as it is undisputed that Plaintiffs[, satellite-dish technicians,] were responsible for providing their own work equipment and vehicles."). These divergent views support, rather than detract from, our conclusion that this factor weighs against granting Miri's motion for summary judgment. That reasonable judges throughout the country disagree on this point strongly suggests that there is a genuine dispute of material fact about whether technicians' use of personal cars, computers, and hand tools is evidence of economic independence.

disagree because a reasonable jury could also find that this factor weighs in favor of employee status.

Although Keller controlled the size of his territory and the number of jobs he accepted each day, we cannot conclude that Keller could have earned greater profits had he expanded his territory or chosen to work elsewhere. Keller's territory was quite large; it covered most of the "thumb" of Michigan and parts of a few surrounding counties. If Miri scheduled Keller at opposite ends of the territory, then Keller could spend most of his day driving. Moreover, if Keller chose to turn down a work assignment because it was too far away, there was no guarantee that there would be another installation to take its place.

We recognize that Keller could have become a subcontractor, like ABC Dishman, and hired assistants.[8] By hiring assistants, Keller arguably could have accepted more jobs every day, and he could have accepted installation jobs in a broader territory. In fact, Keller admitted that he invited a helper, Kyle, and Keller's wife to accompany him sometimes. Kyle and Mrs. Keller primarily provided companionship, but Kyle occasionally helped with the installations, and Mrs. Keller talked with customers and helped with paperwork. Keller finished his assigned jobs slightly faster than usual when he had company, but Kyle and Mrs. Keller did not net Keller more money.

We note, however, that hiring employees carries additional costs that would have affected Keller's ability to earn a greater profit. Wages, vehicles, gas, tools, and computers—these are just a few of the additional expenses Keller would have accrued had he hired assistants to increase the number of installations he could perform every day. Keller paid Kyle ten dollars for every installation and five dollars for every repair. In addition, Miri did not pay technicians an increased fee if the technicians employed assistants. Moreover, although satellite-dish technicians could hire helpers to increase efficiency, that hiring authority may be "illusory" if the defendant-company maintains control over the technicians' hiring ability. *See Scantland*, 721 F.3d at 1317. Here, although Miri did not require that installation helpers contract with Miri directly, Miri exercised some control by adhering to HughesNet's certification requirement.

---

[8]We express no opinion as to whether subcontractors, like ABC Dishman, are also employers within the meaning of the FLSA, and therefore jointly liable for overtime wages. *See Fegley v. Higgins*, 19 F.3d 1126, 1131 (6th Cir. 1994) (citing 29 U.S.C. § 209(d)). The parties have not raised or briefed the issue.

Finally, nothing in the record compels the conclusion that Keller could improve his efficiency such that he could complete more than four installations each day. The two to three hours required for installation, travel time, and time spent preparing and submitting paperwork for each job amount to eight hours total at the very least. Accordingly, it is unlikely that Keller could have earned more if he had just become a bit more efficient. *See Scantland*, 721 F.3d at 1317; *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 308 (4th Cir. 2006) (holding that the evidence did not support a finding that managerial skill and business acumen could affect the plaintiffs' profits when the employer dictated the rate of pay and schedule, and it was not possible to finish a job more efficiently in order to perform another job).

Still, Keller profited from other ventures to some minor extent. Keller admitted that he earned money from Dish Network on two sales during his tenure at Miri. Two of Keller's friends asked how to obtain satellite television; Keller connected those two friends with Dish Network and received commissions. Keller also helped a few customers configure routers for which he collected a $25–35 fee directly from the customer, which he did not turn over to Miri. And there were a few occasions when Keller sold customers routers that he had bought at Wal-Mart, but he said that it was a "nightmare" to do, so he stopped.

Keller's profits also varied if the installation was more complex, but that was not something within his control. Ordinarily, technicians mount the satellite dish onto the customer's roof; however, if a roof mount was not feasible or the customer requested a pole mount, then the technician would have to dig a hole, install a pipe, and put the satellite dish on top of the pipe for which he collected an additional $12. But whether a customer requested a pole mount was not within Keller's control—that depended on Miri's scheduling and on customer demand.

In light of this record, we conclude that there is a material dispute as to whether Keller could have increased his profitability had he improved his efficiency or requested more assignments, and therefore a jury should consider this evidence.[9]

---

[9]We recognize that some other circuit courts have considered the employment status of cable and satellite-dish technicians and concluded that technicians control their profitability. *See, e.g., Freund*, 185 F. App'x at 783; *Chao v. Mid-Atl. Installation Servs., Inc.*, 16 F. App'x 104, 106–07 (4th Cir. 2001) ("An Installer's net profit or loss depends on his skill in meeting technical specifications, thereby avoiding backcharges; on the business acumen with

**5. Miri's Right to Control the Manner Keller Performed His Work**

The fifth factor is whether Miri exercised control over Keller's work.  The district court evaluated the following four considerations when analyzing the control Miri exercised: (1) Keller could refuse work assignments, (2) Miri never supervised or monitored how Keller performed the work, (3) Miri's ability to control Keller's day-to-day work, and (4) Keller could do work for other companies.

Keller had some control over his schedule, but Miri also exercised control.  In the event that Keller could not make a scheduled appointment, he could call the customer and reschedule the installation at a mutually agreeable time.  Keller usually just followed the schedule he received from Miri, but he was free to reject an assignment or take vacation days.  Miri scheduled the installations in blocks, and the technicians were expected to arrive at the customer's house and finish their work within the scheduled time.  But a worker's ability to set his own hours and vacation schedule "is not sufficient to negate control."  *Lilley*, 958 F.2d at 750.  It is also relevant to consider whether "the hours [the worker] [is] required to work on a project . . . , coupled with driving time between home and often remote work sites each day, make it practically impossible for them to offer services to other employers."  *Baker*, 137 F.3d at 1441.  Therefore, a reasonable jury could find that the way that Miri scheduled Keller's installation appointments made it impossible for Keller to provide installation services for other companies.

Miri did not exercise traditional control over how Keller performed his job.  Miri never accompanied Keller during his installation appointments, except when he was in training.  Although Miri does not give technicians step-by-step guides about how to perform their jobs, Miri insists that all technicians perform their jobs in accordance with HughesNet's specifications.  Miri and HughesNet require that all technicians obtain a HughesNet certification to perform the repair and installation services.  And Miri teaches the certification course.  In addition, Miri supplies technicians with HughesNet's and RS&I's instructions about how to

---

which the Installer makes his required capital investments in tools, equipment, and a truck; and on the Installer's decision whether to hire his own employees or to work alone.").  None of these out-of-circuit opinions bind us. *United States v. Simmons*, 587 F.3d 348, 383 (6th Cir. 2009).  We note that the analysis of this factor in the other circuits' opinions is cursory, and therefore less persuasive. *See Freund*, 185 F. App'x at 783; *Mid-Atl. Installation Servs.*, 16 F. App'x at 106–07.  More to the point, reasonable minds could reach different conclusions about whether the record supports a finding that Keller was, in fact, economically dependent upon Miri.

install the dishes. A jury could therefore find that Miri controlled Keller's job performance through its initial training and hiring practices.

Moreover, Miri monitors the quality of installations remotely. HughesNet and RS&I require Miri to submit reports, documenting when technicians start and finish the installation or repair work. In turn, Miri mandates that technicians must submit those hours through WARP. Miri also requires that technicians take photographs of the installation and send those photos to HughesNet and RS&I along with the other post-installation paperwork. Keller stated that he felt pressure to submit paperwork to Miri as soon as possible.

In addition, Miri guarantees the quality of technicians' performance. HughesNet and Miri warrant that the technician would return to the customer's home to fix any problems within thirty days of the installation. If a customer complains within the warranty time period, then the technician must return and fix the satellite dish without any additional compensation.

Moreover, Miri controlled the amount customers paid Keller—and ultimately Miri—for installations or repairs. Miri told Keller when to collect additional fees from customers and how much to charge.

Regardless of these mechanisms of control, Keller made some decisions free from Miri's control. Miri did not object if Keller or any other technician rearranged their schedules to create the most convenient driving route. Miri stated, however, that had Keller missed appointments or arrived late routinely, then Miri would have severed ties with him. Miri did not require that Keller wear a uniform with Miri's or HughesNet's logo. When it came to how to complete every installation job, Keller was free to assess the customers' needs and respond accordingly without checking with Miri so long as the installation met HughesNet's specifications. Finally, Keller independently decided to bring Kyle and Mrs. Keller on some installation jobs to keep him company and improve his efficiency.

There are genuine facts in dispute about whether and how Miri could discipline Keller. Miri asserted that the company has never disciplined a technician. Customers who were unhappy with an installation or repair would submit feedback to HughesNet, HughesNet would contact Miri, and then Miri would relay the complaints to the technicians. In these

conversations, Miri "would discuss . . . the issue and try to find and determine . . . if there was a particular problem on one job or . . . a particular habit that[] [was] being formed" in order to "correct that situation." R. 24-2 at 19 (A. Miri Dep. at 64–65) (Page ID #342). Keller believed that Miri could or would fire him. The record offers reasons to believe this fear was not unfounded: when Keller told Miri that he wanted to "blow off" a customer's complaint, Miri responded with a threatening email. *See* R. 21-8 at 2 (Email Nov. 7, 2012) (Page ID #108). Given the evidence in the record, a reasonable jury could determine that Miri could, in fact, terminate Keller.

We believe that reasonable minds can differ about whether these forms of remote control support a finding that Miri had the power to discipline and control technicians. Unlike in *Brandel*, the record may lead reasonable minds to different conclusions as to whether Miri "retain[ed] the right to dictate the manner in which the details of" how Keller installed satellite dishes. 736 F.2d at 1119. Rather, we believe that there is a genuine dispute as to whether Keller's "whims or choices" affected his profitability, or whether "the demands of the business controlled" his ability to install more satellite dishes every day. *Snell*, 875 F.2d at 806.

### 6. Keller's Role in Miri's Business

The final inquiry is whether Keller rendered services that are "an integral part" of Miri's business. *Brandel*, 736 F.2d at 1119–20. The more integral the worker's services are to the business, then the more likely it is that the parties have an employer-employee relationship. *Keeton*, 2011 WL 2618926, at *6. Miri is a satellite-dish installation provider for HughesNet and iDirect. The only services Miri provides are satellite-dish installation and repair. Accordingly, a reasonable jury would conclude that satellite-dish technicians are integral to Miri's business—a factor that weighs in favor of finding that Keller was a Miri employee.

### 7. Other Factors

The economic-reality test is not an exclusive list of factors. We may and should look to other evidence in the record to determine whether the totality of the circumstances establishes that Miri employed Keller. *See Superior Care*, 840 F.2d at 1059.

A reasonable jury could find that one factor that supports a finding that Keller was an employee is that he held himself out to customers as a representative of HughesNet and not as an independent contractor, as evidenced by the way Keller interacted with customers. Keller never registered for a Federal Employer Identification number. He did not carry business cards or use signs to identify himself as a Miri employee or as an independent contractor. Keller put a HughesNet sticker on his van and wore a hat that read "Do more with Gen4"—HughesNet's advertising campaign slogan. *Id.* at 24 (Keller Dep. at 87–88) (Page ID #380). And Miri offered these shirts, hats, and bumper stickers to technicians for purchase. A uniform can often be a sign of control, but the uniforms were not required, nor did they connect Keller to Miri. We are mindful that Miri never required that Keller do any of this, but we believe these considerations suggest that a jury could reasonably find that Keller was Miri's employee.

### 8. Conclusion Regarding Employee Status

We conclude that there are many genuine disputes of fact and reasonable inferences from which a jury could find that Keller was an employee. Summary judgment for the defendant is not appropriate when a factfinder could reasonably find that a FLSA plaintiff was an employee. *See Scantland*, 721 F.3d at 1319 ("Because there are genuine issues of material fact, and because plaintiffs were 'employees' if . . . reasonable factual inferences are found in plaintiff's favor, the district court erred in granting summary judgment . . . ."); *Imars*, 1998 WL 598778, at *6 ("The appropriate weight of the factors can be more properly assessed after a trial."). We therefore hold that a jury could reasonably find that Keller was a Miri employee, and Miri is not entitled to summary judgment as a matter of law.

## C. Evidence of Overtime

In the alternative, Miri argues that Keller has not introduced evidence that establishes that he worked more than forty hours a week, and therefore this court should affirm the grant of summary judgment in favor of Miri on that basis alone. Appellee Br. at 39–40. "[A] FLSA plaintiff must prove by a preponderance of evidence that he or she performed work for which he or she was not properly compensated." *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 602 (6th Cir. 2009) (internal alterations, quotation marks, and citation omitted). The most common method of proof of undercompensation is discovery and analysis of the employer's records. *Id.*

Keller has not introduced records that definitively establish the hours he worked, but he has testified that he worked more than forty hours a week. In the absence of those employer records, however, a plaintiff's testimony is enough to create a genuine issue of fact. *See Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010).

We do not need to rely on Keller's testimony alone to find that Keller has met his burden to survive summary judgment. Miri's testimony provides sufficient evidence for a reasonable jury to believe that Keller worked more than forty hours each week. Miri's deposition testimony confirms Keller's claim that he worked six days a week. Miri also agreed that Keller completed four jobs a day as often as Miri had that many installation assignments. And Miri agreed that a satellite-dish installation usually took two-and-a-half hours to complete. If Keller accepted four jobs each day, six days a week, and he spent two and a half hours completing each job, then Keller worked sixty hours each week. This estimate does not even include the travel time, or the time Keller devoted to completing the paperwork. Thus, we hold that Keller's and Miri's testimony provide sufficient evidence from which a reasonable jury could determine that Keller worked more than forty hours a week for which Miri did not compensate him.[10]

## III. CONCLUSION

For the reasons set forth in this opinion, we **REVERSE** the district court's judgment and **REMAND** this case for trial.

---

[10] The record suggests that Miri has access to documents that might establish more precisely Keller's hours worked, but those documents are not in the record. We note, however, that the FLSA places the burden of maintaining accurate timekeeping records on the employer. 29 U.S.C. § 211(c); *Fegley v. Higgins*, 19 F.3d 1126, 1132–33 (6th Cir. 1994). If Miri's recordkeeping is inadequate, then Keller "carrie[s] out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson*, 328 U.S. at 687.

_____

**DISSENT**

_____

ALAN E. NORRIS, Circuit Judge, dissenting.  While I have never been a great fan of multi-factor tests, I agree with the Majority that the approach outlined in *Donovan v. Brandel*, 736 F.2d 1114 (6th Cir. 1984), remains the law of our circuit.  *Brandel* requires us to consider six factors when determining whether an individual serves a company as an employee or as an independent contractor for purposes of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201, *et seq.*  Although we are required to assess the individual considerations listed in *Brandel*, our task is not to focus on any single factor but rather to view the situation in its entirety so that we can answer this simple question:  Is plaintiff's role with the company more akin to that of an employee or that of an independent contractor?  *See Brandel*, 736 F.2d at 1116 ("the employment relationship does not lend itself to a precise test, but is to be determined on a case-by-case basis upon the circumstances of the whole business activity").  Yes, the FLSA is remedial in nature, *Ellington v. City of E. Cleveland*, 689 F.3d 549, 554-55 (6th Cir. 2012); and, yes, the summary judgment posture of this appeal requires us to parse the record in a light most favorable to the non-moving party*, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  That said, we must consider the undisputed evidence and decide, as a matter of law, *Brandel*, 736 F.2d at 1116, whether plaintiff raised a material issue of fact respecting his claim to be an employee as defined by the FLSA.  In my view, the district court correctly concluded that he did not.  For that reason, I respectfully dissent.

In this particular appeal, I find it instructive to observe that the same district court judge who ruled in the employer's favor in this appeal denied summary judgment to an employer in a similar case involving individuals who installed cable television services.  *Swinney v. AMcomm Telecomm., Inc.*, 30 F. Supp. 3d 629 (E.D. Mich. 2014).  These two cases highlight what *Brandel* instructs:  that every case must be evaluated on its own facts; it is not a precise test; and, as here, fair minds may differ when applying the law to the undisputed record.

With respect to the first *Brandel* factor—the degree of permanency in the working relationship—the district court concluded that the undisputed evidence favored a finding that

plaintiff worked as an independent contractor: he had no contract with Miri Microsystems, LLC; their working relationship was not exclusive inasmuch as he was able to work for other companies; and he arranged his own schedule. *Keller v. Miri Microsystems, LLC*, No. 12-15492, 2014 WL 1118446, at *6 (E.D. Mich. Mar. 20, 2014). By contrast, in *Swinney*, the court observed that plaintiffs' deposition testimony confirmed that they had "a long and arguably exclusive relationship with Defendant," which supported a conclusion that they were employees despite the fact that they had "signed independent contract agreements." *Swinney*, 30 F. Supp. 3d at 634. In this case, the Majority focuses on plaintiff's contention that he had no time, due primarily to geography, to work for other companies. True, plaintiff lived in a rural part of Michigan where installation opportunities were limited. However, he was not obliged to accept every job offered by Miri. In short, he had sufficient control over his working relationship with Miri to render him an independent contractor. That he chose to accept a high number of jobs with the company speaks more to his own business decisions—where to live, how much money to earn—than those imposed by Miri.

The skill level possessed by an individual also affects our analysis: the greater the skill set, the more likely that a person is an independent contractor. As the Majority concedes, "There is ample evidence in the record to support a finding that satellite-dish-installation technicians are skilled workers." Nevertheless, the Majority focuses upon the fact that the training required by HughesNet was brief and arranged by Miri. It then denigrates the skills required of an installer's job, which it just conceded was "skilled": "[T]his is not the type of profession where success rises or falls on the worker's special skill . . . a pole mount is a pole mount, a roof mount is a roof mount . . . ." Perhaps the job lacks an opportunity for the "artistic flourish" that the Majority equates with skilled labor, but, in my view, the district court correctly concluded that the specialized technical training required coupled with "the transient nature of Plaintiff's employment history as an installer—working as an installer with ABC Dishman before doing so with Defendant LLC and continuing to provide HughesNet satellite installations after terminating those relationships—support the conclusion that he possessed 'special skills' that

gave him the opportunity and flexibility to choose when to begin or end a working relationship." *Keller*, 2014 WL 1118446, at *6.[1]

As the Majority rightly points out, the third *Brandel* factor contemplates the investment made by the worker in tools and other means of performing his job. *Brandel*, 736 F.2d at 1118-19. The more the worker personally invests in job-related equipment, the more likely it is that he is an independent contractor. In this case, plaintiff used his wife's van when performing installations, a van that he had modified to accommodate computer equipment needed to track his jobs. In addition, he provided tools, a ladder, and his own cellular phone, which contained an "app" used for locating satellites and a credit card reader. He also, at Miri's request, paid for general commercial liability insurance, which named Miri as an "additional insured." *See Keller*, 2014 WL 1118446, at *7 (summarizing equipment).

Despite the investment made by plaintiff, the Majority concludes that the evidence, rightly weighed in a light most favorable to plaintiff, tilts in favor of a finding—or at least a jury question—that he was an employee. First, it discounts the use of his wife's van and his cell phone on the theory that those investments served purposes beyond the scope of his employment. Second, it observes that "Miri made significant capital investments in its business." While this statement is true, I am unsure how it factors into the analysis. In short, I respectfully draw a different conclusion from this record: plaintiff's financial investment in work-related equipment was significant enough that he this factor weighs in favor of plaintiff being an independent contractor.

The fourth factor concerns the nature of the working relationship: how much control does the worker have over how he performs his job? As the district court noted, factors such as whether the company insists on a uniform, closely monitors the alleged employee's performance, and the degree to which it, rather than the worker, controls scheduling, all contribute to the analysis of this issue. *Keller*, 2014 WL 1118446, at *7. In finding that this factor favored a conclusion that plaintiff was an independent contractor, the district court made the following observations: plaintiff could determine the number of jobs he would accept per day; the location

---

[1] In contrast, the same judge found this factor far less compelling in *Swinney* because the plaintiffs came to their employer without training and were provided training in an "on the fly" manner. *Swinney*, 30 F. Supp. 3d at 636.

of those jobs; and the manner in which he would perform the work as long as it conformed to the requirements of the satellite provider (which was not Miri). He could also change his schedule if necessary and decline to undertake jobs without adverse consequences for future jobs. In addition, he could, if he chose, employ helpers without the consent of Miri. In contrast to the instant case, the court in *Swinney* reached a different conclusion because "Defendant exercised substantial control over [plaintiffs'] days and . . . Defendant used [a] chargebacks system not only as a quality control measure, but also to punish Plaintiffs for noncompliance with Defendant's 'rule', e.g., arrival time, meetings, etc." 30 F. Supp. 3d at 638. I cite *Swinney* because it highlights how context-sensitive our inquiry is when trying to resolve the employer versus independent contractor question. As the two district court opinions discussed illustrate, the same judge can reach opposite conclusions when facts are sufficiently distinctive to call for a different result.

The fifth factor is whether plaintiff had an opportunity to control his profits. As mentioned earlier, plaintiff lived in a rural area and, by definition, installation jobs were often separated by some distance, making it difficult, if not impossible, for him to complete more jobs than he appears to have been doing. However, as the district court recognized, his decisions regarding his location and the jobs that he chose to take were his alone. In theory, at least, he could have relocated and hired additional helpers. That he did not does not indicate that Miri's actions kept plaintiff from increasing his profit: he retained control over the decisions affecting the nature of his income and he was, in this respect, an independent contractor.

Despite our cataloging of the various factors that inform our decision, in the end we must take a common sense approach and look at the situation in its entirety. *Brandel*, 736 F.2d at 1116. What does that show? Miri served as a middleman in the satellite installation business. The LLC had a single member: Anthony Miri. Its business plan was to work with individuals such as plaintiff who carry out the actual installations. Miri does not provide benefits to these individuals or withhold taxes. Nor does it enter into an employment contract with them. Plaintiff moved from providing installation services for another middleman, to Miri, and later to HugesNet directly, and provided additional products and services to customers directly while doing installations for Miri. It seems abundantly clear that both plaintiff and Miri intended that

plaintiff be an independent contractor and conducted themselves accordingly. It is not clear what more the parties could have done that would have satisfied the Majority that plaintiff was an independent contractor. While simply labeling someone an independent contractor does not make him one, *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947), for the reasons given by the district court and reiterated above, the record, which is not materially in dispute, indicates that plaintiff was an independent contractor as defined by the FLSA.

I respectfully dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 14-1430

MICHAEL KELLER,

        Plaintiff - Appellant,

   v.

MIRI MICROSYSTEMS, LLC,

        Defendant - Appellee.

> **FILED**
> *Mar 26, 2015*
> DEBORAH S. HUNT, Clerk

Before: NORRIS, MOORE, and GIBBONS, Circuit Judges.

**JUDGMENT**

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the judgment of the district court is REVERSED, and the case is REMANDED for trial.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk